# Judge Hellerstein

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

PROFESSIONAL REAL ESTATE SERVICES, INC.,

07 CIV 7175

Plaintiff,

**COMPLAINT**

-against-

LINCOLN PROPERTY COMPANY
COMMERCIAL, INC.,

Defendant.

-------------------------------------------------------------------X



Plaintiff Professional Real Estate Services, Inc. ("PRES") by its attorneys Gage

Spencer & Fleming LLP, for its complaint against defendant Lincoln Property Company

Commercial, Inc. ("LPCC"), upon knowledge as to its own actions and upon information and

belief as to the actions of all others, alleges as follows:

## NATURE OF THE ACTION

1.      PRES is a commercial real estate broker located in California.  In the

spring of 2006, PRES learned that the National Audubon Society ("NAS") was considering a

sale of its headquarters building located at 700 Broadway, New York, New York (the

"Headquarters Site") in order to benefit from the rising value of real estate.  PRES also learned

that, in the event that NAS sold the Headquarters Site, it would relocate its operations to a leased

office space.

2.      In an effort to take advantage of this unique opportunity, PRES prepared a

business plan for NAS.  PRES also contacted LPCC in New York to act as PRES' partner on the

deal and provide local representation to NAS.  PRES brought this opportunity to LPCC because

one of its executives had previously worked for LPCC, and PRES and LPCC had successfully partnered with each other on separate deals.

3.    LPCC agreed to partner with PRES on the NAS deal for an equal split on commissions earned. Going forward, PRES and LPCC jointly provided services to assist NAS in procuring a buyer for the Headquarters Site and entering into a lease. These efforts included the preparation of and delivery of a joint presentation to NAS at its New York offices, meetings with NAS, taking NAS on tours of possible buildings to lease, developing a time line for the sale of the Headquarters Site, and identifying at least one potential buyer for the Headquarters Site. By partnering with PRES, LPCC not only learned about the opportunity to broker the sale of NAS' Headquarters Site and relocate NAS to leased office space, LPCC also gained access to exclusive information about NAS and its real estate preferences.

4.    Subsequently, PRES learned that contrary to their agreement with LPCC, and without any notice to PRES, LPCC independently entered into an agreement with NAS and purchased the Headquarters Site itself. PRES also learned that LPCC independently relocated NAS to a leased office space. Incredibly, PRES obtained this knowledge from a NAS newsletter. PRES immediately contacted LPCC for an explanation to which LPCC responded by saying "[t]hat's life."

5.    As a result of LPCC's breach of the agreement it entered into with PRES to co-broker both NAS transactions, PRES has been deprived of its share of the commissions to which it is entitled from the sale of the Headquarters Site and NAS' relocation to a leased office space, plus interest, attorneys' fees, and costs.

## THE PARTIES

6.      Plaintiff, Professional Real Estate Services, Inc. ("PRES"), is a California corporation with its principal place of business located at 4300 Von Karman Avenue, Newport Beach, California 92660.  PRES provides commercial brokerage services, as well as property and asset management, corporate real estate consulting, development and construction, and acquisition and investment services.

7.      Defendant, Lincoln Property Company Commercial, Inc. ("LPCC"), is a Texas corporation with its principal place of business located in Dallas, Texas.  LPCC also has an office located at 405 Park Avenue, Suite 1704, New York, New York 10022.  LPCC develops, manages, and provides broker services for residential and commercial real estate property.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction under 28 U.S.C. § 1332 based on diversity of citizenship between the parties.  Plaintiff, PRES, and Defendant, LPCC, are citizens of different states, and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

9.      Venue is proper pursuant to 28 U.S.C. § 1391(a) given that a substantial part of the events giving rise to this action occurred within this Court's district.

## THE FACTS

### I.    PRES Learns Of The NAS Opportunities

10.     In spring of 2006, PRES discovered that NAS might sell its Headquarters Site and relocate to another leased property in New York City to benefit from the rising value of

real estate in New York City. PRES also learned that NAS wanted to locate to a "green building," i.e. an environmentally friendly building.

11.    PRES was able to obtain this valuable knowledge because Glenn Olson, then the Senior Vice President of Field Operations at NAS, was the father of one of PRES' salespeople, Kyle Olson.

12.    Upon learning about the NAS opportunities, PRES began to prepare a business plan for NAS.

## II.    PRES And LPCC Agree To Co-Broker The NAS Transactions

13.    PRES also decided to contact LPCC and propose co-brokering the sale of the NAS property and the relocation of NAS to leased office space. PRES decided to share its valuable knowledge about the NAS opportunities with LPCC because PRES, which is located in California, wanted to ensure that NAS had local representation in New York City and LPCC had a New York City office. PRES also chose LPCC because the Senior Vice President of PRES, Mark Bennett, had previously worked at LPCC. Finally, PRES chose LPCC because the two firms had previously co-brokered other deals together.

14.    LPCC and PRES jointly agreed that the two firms would co-broker the sale of the Headquarters Site and the relocation of NAS to leased office space. PRES and LPCC agreed that they would split any profits, commissions, or fees earned on these transactions equally. All discussions were consistent with the notion that PRES and LPCC would co-broker the deal with NAS.

15.    In the time leading up to the presentation, PRES and LPCC had a number of conference calls and worked on the joint presentation and creation of visual aids.

### III.    PRES And LPCC Make A Joint Presentation To NAS

16.    On April 11, 2006, Mark Bennett and Kyle Olson of PRES flew to New York City and met with Jim Stein and Jim Kelley of LPCC at LPCC's New York office. The PRES and LPCC brokers spent the day preparing a joint presentation for Bob Perciasepe, Chief Operating Officer of NAS. The discussions centered around the visual aid presentation and a comprehensive strategy for the disposition of the Headquarters Site and leasing of a facility.

17.    The next day, on April 12, 2006, Bennett and Olson of PRES and Stein and Kelley of LPCC made a joint presentation to Perciasepe and other NAS executives. The presentation was at the Headquarters Site and lasted approximately 2 hours. The presentation set forth a strategy designed to assist NAS in the disposition of the Headquarters Site and a relocation plan. The presentation also detailed potential profits from the sale of the Headquarters Site and new leases available in downtown Manhattan. The presentation was co-created by PRES and LPCC brokers, and both companies' logos appeared on all presentation materials.

18.    During the presentation, PRES explained to NAS that it had asked LPCC to assist PRES in brokering these transactions because of its LPCC's local presence and due to the existing relationship between PRES and LPCC. All questions received from NAS during the presentation were jointly answered by LPCC and PRES.

19.    Following the presentation, Bennett and Olson of PRES and Stein and Kelley of LPCC went out together to celebrate the success of the presentation. Glenn Olson of NAS later joined them.

### IV.    PRES And LPCC Continue To Provide Joint Services To NAS

20.    Following the joint presentation, PRES and LPCC continued to jointly provide services to NAS. Among other things, on April 25, 2006, Bennett of PRES and Stein of

LPCC corresponded by email to discuss taking Perciasepe of NAS on tours of two or three buildings in lower Manhattan as part of the relocation plan.

21.    In these emails, Stein advised Bennett and Olson of PRES that during these tours, he is going to try to convince Perciasepe to "move forward with the sale of 700 Broadway." Stein stated that he hopes this will "begin to establish ourselves as his brokers and lead to an exclusive in the near future." Stein goes on to say that he will bring up the subject of an exclusive with Perciasepe and "if things move along in that direction or I could rely on you [Mark Bennett] and Kyle [Olson] to bring that to fruition before Denver."

22.    On April 27, 2006, Stein and Perciasepe toured several "green buildings" in Manhattan as part of the NAS plan to relocate to an environmentally-friendly property. That same day, Stein reported back to Olson and Bennett via email that the tours "went well." PRES and LPCC then set up a conference call to discuss their next steps in obtaining an exclusive with NAS.

23.    Subsequently, on or about May 17, 2006, Perciasepe made a presentation to NAS' board of directors regarding the sale of the Headquarters Site and NAS' relocation. Perciasepe's presentation to the board was based upon the joint presentation previously given by PRES and LPCC.

24.    On that same day, Stein wrote Kyle Olson to ask whether he had heard any feedback from his father regarding the presentation. Stein and Bennett also proposed a detailed plan for the disposition of the Headquarters Site and its relocation to leased office space. Stein and Bennett's plan described the various tasks that PRES and LPCC would undertake. The plan specifically listed whether PRES, LPCC or both would be responsible each task. Stein concluded his email by stating:

> As Mark [Bennett] indicated in his email, let's both focus on the exclusive when Bob [Perciasepe] returns to NY.

25.    From approximately May 18, 2006 to May 23, 2006, Bennett of PRES and Stein of LPC corresponded via email and finalized a detailed timeline for PRES and LPCC duties leading up to the sale and new NAS lease. The timeline was entitled "Acquisition of Leased Office Space & Disposition of 700 Broadway June 2006 – March 2007 Timeline," and both Pres' and LPCC's logos appeared at the bottom.

26.    Bennett and Stein also jointly created and edited a Letter of Engagement for NAS. The draft Letter stated,

> Lincoln Property Co. and The PRES Companies ("Brokers") are hereby appointed as our sole agent and broker and grated the exclusive right to: (i) sell the premises known as 700 Broadway ("Building" or "Property"); and (ii) find, negotiate for an secure premises on behalf of the National Audubon Society ("AS"); and we and our designees agree to acquire such premises exclusively though you. . . AS agrees to pay Brokers (1) full commission computed and payable in accordance with the annexed Schedule.

The Letter further stated,

> Brokers will acquire the details on all contemplated or presently available locations and carefully select and present to AS at a time convenient to AS, those which in your opinion are the most suitable for our purposes. If and when AS decides on a location, Brokers will negotiate on our behalf and in our interest, taking advantage of your knowledge of real estate values and rentals.

NAS, PRES and LPCC were all listed as signatories to the Letter of Engagement.

27.    PRES and LPCC continued to discuss efforts to execute the strategy developed for NAS. These efforts included an attempt by Olson of PRES to set up a dinner with Perciasepe through Olson's father at NAS and an attempt by Stein of LPCC to show the Headquarters Site to a potential buyer, New York University ("NYU").

7

28.    With regard to a potential sale of the Headquarters Site to NYU, Stein wrote Bennett and Olson at PRES on June 20, 2006 and said that he wanted to be "proactive" to avoid the risk that "NYU will hear about the property and we could get cut out completely in a principle to principle transaction." Before contacting Perciasepe at NAS to obtain authorization from NAS to show the space, however, Stein asked for and received PRES' permission. Stein then contacted Perciasepe and proposed showing the space to NYU.

29.    On July 4, 2006, Perciasepe responded to Stein's proposal by advising him that NAS already had an ongoing relationship with NYU and that NAS may speak with NYU directly about a potential sale. The next day, Stein wrote to Bennett and Olson at PRES and said that he was "flabbergasted" by Perciasepe's response. Stein further wrote in his email

> [w]e pitched Audubon in April and we all agreed that it would be everyone's best interests to have a real estate professional like LPCC/PRES represent Audubon. Now it is July, and Bob tells us that he prefers to handle any real estate discussions with NYU privately – Remarkable! I'm not in the business of providing my expertise for gratis and the idea of Audubon selling 700 Broadway to NYU by using our assumptions, strategy, plan and pricing is reprehensible. I worked too hard on this assignment for this to happen. If you two still plan to meet with Bob [Perciasepe] this month in California, I ask that you have a serious conversation about our role in this assignment.

30.    In response, Kyle Olson contacted his father in an effort to arrange a dinner with Perciasepe.

31.    Also, in an effort to save the deal for both firms, Bennett of PRES emailed Bob Perciasepe on July 14, 2006, copying Stein at LPCC and said that it was essential for NAS to use a broker to sell its property and relocate and that PRES and LPCC would offer NAS a "commission earn-out format" if NAS used PRES and LPCC. Stein, however, objected to

Bennett's offer of the earn-out format to NAS. In response, Bennett advised Stein that he "[has] not committed our team to anything contractually, nor will I do so without your blessing."

32.     On July 16, 2007, Perciasepe emailed Bennett and proposed a meeting with PRES the following day at Orange County Airport to discuss the PRES/LPCC exclusive agreement. The meeting was short in duration, given Perciasepe's travel schedule, but PRES discussed in more detail, in addition to a sale of the Headquarters Site, other options with Perciasepe relating to the Headquarters Site from which PRES and LPCC would mutually benefit. On July 28, 2006, PRES sent Perciasepe and Olson at NAS a business plan that outlined three different scenarios for NAS to consider in the decision process for disposition of the Headquarters Site, one of which was a proposal for NAS and PRES to joint venture.

## V.     LPCC Breaches Its Agreement With PRES

33.     In March of 2007, Kyle Olson received a monthly newsletter from NAS which reported that LPCC had bought the Headquarters Site from NAS.

34.     In addition, the NAS newsletter stated that LPCC relocated the NAS headquarters to a World Trade Center office downtown.

35.     By entering into an agreement directly with NAS to purchase the Headquarters Site and re-locate NAS to a new office space, LPCC breached its agreement with PRES by which they would pool their efforts and co-broker the NAS deals that PRES had brought to LPCC's attention and share commissions on an equal basis.

36.     On March 22, 2007, in light of PRES' and LPCC's agreement, Bennett wrote an email to Stein and Kelly at LPCC asking for explanation as to how LPCC could conceal its purchase of the Headquarters Site and the relocation of NAS to a new space from PRES. In his email, Bennett wrote

Jim(s)- I am trying to grasp this picture......so, not only have you acquired the Audubon Building without a whisper to my team, but you now have consummated the relocation of Audubon to boot!! These are 2 very large deals that you never, and I repeat never, would have transacted had it not been for PRES. Talk about biting the hand that feeds you. This is preposterous. How embarrassing for me, being a former collegue at [LPCC], to explain this to my partner and firm. . .

In response, Stein simply wrote "[t]hat's life."

## FIRST CAUSE OF ACTION

### Breach of Contract

37.     PRES repeats and re-alleges the allegations contained in paragraphs 1 through 36 of this Complaint as if fully set forth herein.

38.     PRES is a licensed real estate brokerage company located in California. In spring, 2006, PRES obtained valuable knowledge that NAS wanted to sell its Headquarters Site and lease office space in a "green building" to take advantage of the rising cost of New York City real estate.

39.     PRES contacted LPCC in New York and the parties entered into a firm agreement. Pursuant to the parties' agreement, PRES shared the valuable information that it had obtained about the sale of the Headquarters Site owned by NAS and the relocation of NAS to leased office space in a "green building" with LPCC. PRES and LPCC agreed that they would co-broker both the sale and relocation for NAS. PRES and LPCC also agreed that they would split the commissions for these brokerage services to NAS on an equal basis. Each party agreed to absorb their own expenses.

40.     Pursuant to their agreement, LPCC and PRES pooled their efforts to provide brokerage services to NAS. This included the co-creation of a joint presentation to NAS

which set forth a strategy designed to assist NAS in the disposition of the Headquarters Site and a relocation plan. The presentation also detailed potential profits from the sale of the Headquarters Site and new leases available in downtown Manhattan. The presentation was co-created by plaintiff and defendant, and both companies' logos appeared on all presentation materials. This further included coordinating tours for NAS of potential spaces to lease and meetings with NAS. This also included the joint preparation of a plan and time line designed to assist NAS in selling its property and relocating to a new office space. Finally, this included the joint preparation of a draft Letter of Engagement for NAS. Both PRES' and LPCC's logos appeared on all of these materials.

41.     In or about March of 2007, LPCC breached the parties' agreement by entering into a separate, independent agreement with NAS to purchase the Headquarters Site and re-locate NAS to leased office space.

42.     LPCC has benefited financially from its purchase of the Headquarters Site and its relocation of NAS to leased office space. LPCC had a duty to share any benefits that it received from its agreement with NAS with PRES equally. However, in breach of the parties' agreement and despite the fact that the parties' pooled their efforts to provide co-brokerage services to NAS, LPCC has refused to share the benefits that it earned from independently assisting NAS with the sale of the Headquarters Site and relocating NAS to a leased office space.

43.     PRES has been damaged by LPCC's breach of the parties' agreement in that it has been deprived of commissions that it would have earned from the sale of the Headquarters Site as well as commissions it would have earned from the relocation of NAS to leased office space. PRES has further been damaged in that it expended time, effort, services

and expenses to co-broker the sale of the Headquarters Site and the re-location of NAS to leased office space with LPCC.

44.    As a result of the foregoing, PRES has been has been damaged in an amount to be determined at trial, but no less than $75,000.00 plus interest, attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### Accounting

45.    PRES repeats and re-alleges the allegations contained in paragraphs 1 through 36 of this Complaint as if fully set forth herein.

46.    PRES requests an accounting to determine the amount of commissions it would have earned from the sale of the Headquarters Site and relocation of NAS to leased office space pursuant to PRES's agreement with LPCC to co-broker these transactions and share commissions equally.

## THIRD CAUSE OF ACTION

### Unjust Enrichment

47.    PRES repeats and realleges the allegations contained in paragraphs 1 through 36 of this complaint as if fully set forth herein.

48.    But for PRES, LPCC would not have known about the opportunity to broker the sale and relocation of NAS.

49.    LPCC benefited from the sale and relocation of NAS at the expense of PRES' skill, labor, and expenditures.

50.    LPCC also benefited from PRES' original business plan to lease new NAS headquarters and provide relocation services for NAS.

51.    LPCC also benefited from PRES' contacts with NAS.

52.    Despite enjoying these benefits, LPCC unjustly has refused to pay PRES the commissions to which it is entitled for procuring the sale of the Headquarters Site. LPCC has also refused to pay PRES the commissions to which it is entitled for the relocation of NAS to leased office space. PRES has further been damaged in that it expended time, effort, services and expenses to co-broker the sale of the Headquarters Site and the re-location of NAS to leased office space with LPCC.

53.    As a result of the foregoing, PRES has been damaged in an amount to be determined at trial, but no less than $75,000.00 plus interest, attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

### Unfair Competition

54.    PRES repeats and realleges the allegations contained in paragraphs 1 through 36 of this complaint as if fully set forth herein.

55.    PRES and LPCC both provide brokerage services.

56.    PRES had exclusive knowledge that NAS wanted to sell its Headquarters Site and relocate to a leased office space to take advantage of the rising cost of real estate in New York.

57.    LPCC agreed to enter into a joint venture with PRES in an effort to sell the property for NAS and relocate NAS to a leased office space. But for PRES, LPCC would not have known about the NAS opportunities. Additionally, by entering into a joint venture with

PRES, LPCC was able to gain confidential information about the NAS opportunities, including

contacts at NAS, the price at which NAS would like to sell its property, the type of building NAS

would like to relocate to, and feedback on the joint presentation and other information that PRES

and LPCC had provided to NAS. LPCC unfairly misappropriated this information from PRES.

58.     LPCC also misappropriated PRES' labor, expenditures and skill in

servicing NAS. LPCC used the information that it misappropriated from PRES to structure a

deal with NAS independent from PRES by which LPCC would purchase NAS' property directly

and relocate NAS to a leased office space.

59.     Due to LPCC's misappropriation of PRES' commercial advantage with

regard to the NAS opportunities, PRES was deprived of commissions it would have earned from

the sale of the Headquarters Site and commissions it would have earned from relocating NAS to

a leased office space. PRES has further been damaged in that it expended time, effort, services

and expenses to co-broker the sale of the Headquarters Site and the re-location of NAS to leased

office space with LPCC. As a result of LPCC's misappropriation, PRES has been damaged in an

amount to be determined at trial but no less than $75,000.00 plus interest, attorneys' fees and

costs.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Professional Real Estate Services, Inc. prays for

judgment in its favor as follows:

   a)  on the first cause of action, damages against defendant LPCC in an

       amount to be determined at trial, but no less than $75,000.00 exclusive

       of interest, attorneys' fees and costs;

b) on the second cause of action, an accounting to determine the amount of commissions PRES would have earned from the sale of the Headquarters Site and relocation of NAS to leased office space pursuant to PRES's agreement with LPCC to co-broker these transactions and share commissions equally;

c) on the third cause of action, damages against defendant LPCC in an amount to be determined at trial, but no less than $75,000.00 exclusive of interest, attorneys' fees and costs;

d) on the fourth cause of action, damages against defendant LPCC in an amount to be determined at trial, but no less than $75,000.00 exclusive of interest, attorneys' fees and costs; and

e) attorneys' fees and costs incurred in prosecuting this action;

-and-

e) such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff Professional Real Estate Services, Inc. demands trial by jury of all the issues raised herein.

Dated: New York, New York
    August 10, 2007

GAGE SPENCER & FLEMING LLP

By:

    G. Robert Gage, Jr. (GG 3957)
    Laura-Michelle Rizzo (LR 7799)

410 Park Avenue
New York, New York 10022
Tel. (212) 768 – 4900
Fax. (212) 768-3629

*Attorneys for Plaintiff*
*Professional Real Estate Services, Inc.*

16